Annie Lee S. **HOLLIDAY**, Appellant,

v.

The **GREAT ATLANTIC & PACIFIC TEA COMPANY**, Appellee.

No. 8793.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 23, 1963.

Decided March 7, 1963.

H. B. Richardson, Sumter, S. C., and W. L. Clifton, Sumter, S. C. (George C. James, Sumter, S. C., on brief), for appellant.

Shepard K. Nash, Sumter, S. C. (John S. Wilson, Sumter, S. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, BELL, Circuit Judge, and MICHIE, District Judge.

MICHIE, District Judge.

In this personal injury case a jury brought in a verdict of $10,000.00 for the plaintiff, Annie Lee S. Holliday. On motion of the defendant, The Great Atlantic & Pacific Tea Company (hereinafter called "A & P"), the court set aside the verdict and entered judgment *non obstante veredicto* for the defendant. There is no opinion of the court so two questions are presented to this court: (1) Was there sufficient evidence to justify a finding that there was negligence on the part of the defendant which justified a verdict for the plaintiff; and (2) if so, was the evidence so clear that negligence on the part of the plaintiff contributed to the injury that a verdict based on the negligence of the defendant, if found, should be set aside because of the defendant's contributory negligence?

### The Facts

The accident occurred on a parking lot about one hundred feet in width and eighty feet in depth in front of an A & P store and a store of the Pittsburgh Plate Glass Company at Sumter, South Carolina. Slightly more than two-thirds of the parking lot is in front of the A & P and the remainder in front of the Pittsburgh Plate Glass Company. The two companies control the portions of the parking lot that are in front of their respective establishments.

In the approximate center of the parking lot (and therefore in the portion of the lot controlled by A & P) there is a raised median strip of concrete, running in a direction perpendicular to the front of the A & P store, about forty-six feet in length and eighteen inches in width with an average height of six inches tapering off from the center to a height of about four inches at the sides. Parking spaces for cars to park at an angle with this median strip were painted in yellow on the surface of the parking lot and the median was similarly painted but the paint was non-luminous and, at the time of the accident, the median had not been painted for more than eight months and the paint had been "beaten off" of it.

There are three floodlights near the front of the parking lot, two (the northeastern and the middle) being under the control of the defendant while the northwestern was under the control of Pittsburgh Plate Glass Company. It is conceded that the northeastern light was out on the night in question and there is evidence that all three lights were out on the night in question. On the other hand there is evidence that there was a bright city street light which was on and only about eight feet from the northeastern parking lot light which had concededly been off for some time (the A & P manager testified that he had not bothered to get it fixed as he thought there was ample light in that area—doubtless because of the existence of the city street light). There was also a large lighted A & P sign at the northeastern corner of the lot. There was light from a filling station just across Sumter Street which formed the northern boundary of the parking lot.

The A & P and Pittsburgh Glass Company stores were brightly lighted and the light shone out through large plate glass windows and light also shone directly onto the lot from the Smart Finance Company building which ad-

joined the parking lot to the west, there being there also a large plate glass window from which lights shone out on the parking lot and a large neon sign and a lighted sign on top of the building.

Plaintiff had been to the A & P store a few times before the accident but had never walked in the parking lot. On the evening of the accident she went to the store with her daughters, Mrs. Saunders and Mrs. Mahoney, Mrs. Saunders driving them in her car. Mrs. Mahoney and the plaintiff got out before Mrs. Saunders parked the car and went in the A & P store. Soon thereafter, as the store was crowded, plaintiff decided to leave and go to her daughter's car. She came out of the store and after a few moments thought she recognized her daughter's car parked on the west side of the median strip (although the plaintiff apparently did not know of the existence of the median) and, of course, facing cars parked on the east side. Traffic in the parking lot regularly came in to the west of the median and went out to the east and some cars were coming in at the time. It was dusk (the time appears to have been somewhere between 6:15 and 7:15 p. m. on February 4th) and cars were coming in on the west side of the parking lot with their lights on. The plaintiff was afraid to go directly against this oncoming traffic to the car she thought was her daughter's on the west side of the median. She chose therefore to go around some of the cars parked on the east side of the median and then come through between two of them to what she thought was her daughter's car. Of course in so doing she would have to cross the median but she did not know the median was there.

The plaintiff proceeded accordingly and she testified that when she got between two of the parked cars, headed towards what she thought was her daughter's car, she realized that it was quite dark between the cars and she was proceeding very carefully and looking at the ground as well as she could—using the expression "looking for a banana-peel" which we do not take too literally as she

must have meant it in a broader sense, though the possibility of slipping on a banana peel was doubtless uppermost in her mind. At any rate she proceeded, did not see the median, tripped on it, fell and was injured. As there is no contention with respect to the size of the verdict we need not discuss her injuries.

### The Negligence of the Defendant

The plaintiff claims that the negligence of the defendant consisted of the following:

1st. In the very existence of the median;

2nd. In the failure to re-paint the median within a period of more than eight months; and

3rd. In the failure to maintain adequate lighting in the parking lot.

As to the first ground we do not believe that a jury question was presented. These medians, curbs or whatever they may be called are quite common in parking lots and there was ample evidence to that effect. However, we believe that the failure to repaint the median when the yellow paint was "knocked off" and also the lighting situation raised jury questions and that the jury could properly find that the defendant was negligent in these respects and that such negligence proximately caused the injury to the plaintiff.

There was evidence that with the paint "knocked off" the color of the median became the same as the color of the surface of the parking lot and that condition would certainly make it harder to see. In other words if it had been painted yellow the plaintiff might have seen it and the jury would be warranted in finding that she probably would have seen it and that thus the accident would have been avoided.

The light situation is less simple. If the light at the northeast corner of the parking lot had been on it could not have gone through the bodies of the parked cars and might simply have deepened the shadows between them. Counsel say,

properly, that as the cars were parked, the light at the northwest corner of the lot, if on, would have gone between the cars. This might well be so but this light was on the part of the parking lot "controlled" by Pittsburgh Plate Glass. The effect of the light at the center of the lot, if on (as to which the testimony was somewhat conflicting), is still more speculative. In view of the conflicting testimony, however, we believe that the jury was warranted in finding that if all the lights controlled by A & P had been on the accident would not have happened. To reach their verdict they must have found either this or that the failure to repaint the median was the cause of the accident and we think that there was enough evidence on either ground to sustain a verdict for the plaintiff.

■ However, the defendant contends that its duty to the plaintiff did not extend beyond "the duty of exercising ordinary care to keep the passageways, sidewalks and such other parts of the premises as are ordinarily used by the customers in transacting business in a reasonably safe condition." Bruno v. Pendleton Realty Co., Inc., 240 S.C. 46, 124 S.E.2d 580. And it contends that the route being followed by the plaintiff at the time she was injured was not "ordinarily," i. e., "regularly, commonly, or usually" used by customers of the defendant. We think, however, that the court may take judicial notice of the fact —and certainly the jury could find as a fact—that all portions of a parking lot are ordinarily so used.

### Contributory Negligence

■ Counsel for the defendant argues on this score: (1) that the plaintiff should have gone directly down the west side of the parked cars to the car she thought was her daughter's instead of first going around the cars parked on the east side of the median and (2) that she should not have undertaken to go between two of the cars parked to the east of the median when she found that it was so dark between them that she could not see well.

As to the first point it seems clear to us that plaintiff was fully justified in choosing what she thought would be the safer route to the east rather than going directly forward on the west of the parked cars in the face of oncoming traffic in the dusk or dark with blinding lights coming towards her.

The second contention raises a somewhat closer question. After the plaintiff had testified that she could not see when she got between the cars defense counsel on cross-examination asked, "And you went on, blind, into a death trap there?" and, after a feeble attempt at evasion, plaintiff replied, "I did. I went into it." When the situation is referred to as a "death trap" plaintiff's walking into it does sound like contributory negligence. And the jury might well have found that it was. But it didn't. And we do not think it was compelled to do so. The term "death trap" was of course a theatrical exaggeration on the part of counsel. Plaintiff is held only to the standard of the ordinary prudent man and we believe that the jury was fully warranted in finding that an ordinarily prudent man, finding himself between the cars and unable to see clearly might well have done just what plaintiff did: proceed with caution, with one hand on a parked car and looking as carefully as she could for a "banana peel" or anything else that she might slip on.

We feel, therefore, that the court erred in setting aside the verdict and entering judgment *n. o. v.* The order of the court must therefore be set aside and final judgment entered for the plaintiff for the amount found in the verdict of the jury.

The case will be remanded to the District Court for the entry of such an order.

Reversed and remanded.